**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

DAMANY BROWNE,
individually and on behalf of a class of
similarly situated persons,

                  Plaintiff,

     **v.**

ARKK FOOD COMPANY, and
WAHLBURGERS I, LLC,

                  Defendants.

**Case No.**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Damany Browne ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, brings this Class Action Complaint against Defendants Arkk Food Company and Wahlburgers I, LLC ("Defendants") and alleges the following upon information and belief, except for those allegations pertaining to Plaintiff, which are based on personal knowledge:

## NATURE OF THE ACTION

1.      This is a class action lawsuit regarding Defendants' manufacturing, distribution, advertising, marketing, labeling, distribution, and sale of Wahlburgers pickles ("Products" or "Pickles")[1] that are sold in grocery stores nationwide and marketed as, among other things, "fresh," "all natural," and containing "no preservatives" ("Representations"). Unfortunately for all reasonable consumers, including Plaintiff, these claims are false and misleading.

2.      Far from being "fresh," "all natural," and preservative free, the Pickles contain considerable amounts of an artificial chemical preservative, sodium benzoate, designed to lengthen the Pickles' shelf life.

3.      Despite including this artificial chemical preservative, sodium benzoate, in their Pickles, Defendants go to considerable lengths to mislead consumers into believing the Pickles are free from such preservative:

   a. Defendants label the Pickles with the words "All Natural" and "No Preservatives";

   b. Defendants place the term "Fresh" as the first word for all of the Pickles' varieties directly on the front labels of the Pickles;

---

[1] The Products refer to the following Wahlburgers Pickles varieties: Fresh Dill Spears; Fresh Dill Chips; Fresh Dill Chips Hot. Plaintiff reserves the right to amend the complete list of Pickles subject to this lawsuit based on facts obtained in discovery.

c.   Defendants omit the artificial chemical preservative as an ingredient – a material fact to Plaintiff and all reasonable consumers – on the Pickles' labeling and any marketing regarding the Pickles.

4.    Defendants make the Representations and omissions to increase profits and market share in the consumer food product market, specifically the pickle market. Indeed, consumers place value on "natural" products.

5.    Consumers have become increasingly concerned about the effects of synthetic, artificial, and chemical ingredients in food, dietary supplements, cleaning products, bath and beauty products, and everyday household products. Companies such as Defendants have capitalized on consumers' desire for purportedly "natural products." Indeed, consumers are willing to pay and have paid a premium for products branded "natural" over products that contain synthetic ingredients. In 2015, sales of natural products grew 9.5% to $180 billion.[2]  Reasonable consumers, including Plaintiff and Class Members, value natural products for important, material reasons, including the belief that they are safer and healthier than alternative products not represented as natural.

6.    Before placing the Pickles into the stream of commerce and into the hands of consumers to eat, Defendants knew or should have known that the Products contained an artificial chemical preservative, sodium benzoate, but Defendants misrepresented, omitted, and concealed

---

[2]   *Natural Products Industry Sales up 9.5% to $180bn Says NBJ,* FOOD NAVIGATOR, http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-claims/(page)/6; *see also*  Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (February 22, 2017), http://www.investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp (Study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care industry is on track to be worth $25.1 million by 2025); *Natural living: The next frontier for growth? [NEXT Forecast 2017]*, NEW HOPE NETWORK (December 20, 2016), http://www.newhope.com/beauty-and-lifestyle/natural-living-next-frontier-growth-next-forecast-2017.

this material fact to all reasonable consumers, including Plaintiff and Class members, by not including the words sodium benzoate anywhere on the Products' labeling.

7.    Plaintiff and Class members saw Defendants' Representations before purchasing the Pickles.

8.    Defendants' Representations are material affirmations of fact that became part of the basis of the bargain between Plaintiff, Class members, and Defendants when purchasing the Pickles.

9.    Plaintiff and Class members purchased the Pickles and paid a price premium based on Defendants' Representations and omissions.

10.    Pickles that contain artificial chemical preservatives typically sell for approximately one or two dollars less than truly fresh pickles that do not. For example, a 32-ounce Wahlburgers Fresh Dill Spears container costs, when not on sale, $7.99[3] or $0.25 per ounce. But a 24-ounce container of Vlasic Kosher Dill Spears—which does not make any "natural" or preservative free claims—costs $3.49,[4] or $0.14 per ounce.[5]

11.    Because Defendants' false and misleading Representations dupe reasonable consumers into believing the Pickles feature premium attributes (are "fresh," "all natural," and free from artificial chemical preservatives), Defendants' Representations thus dupe reasonable consumers into paying premium prices for the Pickles, even though they do not actually feature the premium attributes for which the consumers, including Plaintiff and class members, pay.

---

[3] https://www.hy-vee.com/aisles-online/p/3318751/Wahlburgers-Fresh-Dill-Spears (last visited April 12, 2023) (Note: at the time of this Complaint, this particular store sold Wahlburger Pickles at a sale price of $6.29 – still far above the price charged by Vlasic).
[4] https://www.hy-vee.com/aisles-online/p/51684/Vlasic-Kosher-Dill-Spears (last visited April 12, 2023).
[5] Plaintiff provides this example of the price premium of Defendants' Pickles containing the Representations. A more detailed price premium damages analysis will be conducted by an expert later in the case after discovery.

12. Defendants are therefore liable to Plaintiff and Class members for selling the Pickles without disclosing that the Pickles contained or risked containing an artificial chemical preservative, in contravention of their stated Representations and omissions.

13. This lawsuit seeks to recover monetary damages on behalf of Plaintiff and class members.

## PARTIES

14. Plaintiff Damany Browne is a resident and citizen of Brooklyn, New York. Plaintiff Browne has purchased numerous varieties of the Products, including Wahlburgers Fresh Dill Spears and Wahlburgers Fresh Dill Chips, multiple times during any statutory limitations period. Plaintiff purchased the Products in person in grocery stores, including Aldi in Brooklyn, New York. Most recently, Plaintiff purchased the Products between January and April 2023 at the Products' retail price.

15. According to the testing attached as Exhibit A, the products tested had "best by date"—stated as "BBD" on the testing results—of 09/03/22, 10/27/22, 11/24/22, and 07/02/23. *See* Exhibit A. Each of these tests showed significant levels of sodium benzoate. *See id.* These initial tests were confirmed by fourteen additional tests conducted on products with BBD dates from January to March 2023. *See* Exhibit B. According to the sworn statement of Mr. Kahl, "[t]he level of sodium benzoate detected across all samples is present at intentional usage levels that the brine has been formulated with." Exhibit B ¶ 2.

16. The Pickles have 120-day expiration dates, so that means these Pickles were manufactured between May 2022 and March 2023—all showing significant amounts of sodium benzoate. Plaintiff purchased the Pickles during this time. Given the consistent presence of sodium benzoate in testing for the Pickles during this time, it is reasonable to infer Plaintiff's pickles

likewise contained sodium benzoate. Based on information and belief, the Pickles Plaintiff purchased between January and April 2023 contained sodium benzoate.

17. Plaintiff and reasonable consumers believe that products that are labeled as natural do not contain synthetic ingredients. Plaintiff and reasonable consumers believe a synthetic ingredient is formulated or manufactured by a chemical process or a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources.

18. When purchasing the Pickles, Plaintiff Browne read and reviewed the accompanying labels and disclosures and understood them as representations by Defendants that the Pickles were adequately manufactured, labeled, and free from defects and that the Representations were true. Plaintiff Browne read Defendants' Representations when deciding to purchase the Pickles, and these Representations were part of the basis of the bargain. Had Defendants not made the false, misleading, and deceptive Representations and omissions alleged herein regarding the Pickles, Plaintiff Browne would not have been willing to purchase the Pickles. Plaintiff Browne paid a price premium for the Pickles based on Defendants' Representations and material omission. Accordingly, Plaintiff Browne was injured and lost money due to Defendants' mislabeling and deceptive conduct.

19. Defendant ARKK Food Company ("ARKK") is a corporation incorporated under the laws of Michigan, with its principal place of business in Bloomfield Hills, Michigan. ARKK creates and produces food products and is the distributor for Wahlburgers Pickles and the exclusive licensee of Wahlburgers' retail products. Upon information and belief, ARKK controls the entire line of Wahlburgers retail products. Upon information and belief, ARKK controls the Wahlburgers Pickles' recipes and labeling. ARKK selected and approved the recipe for Wahlburgers Pickles, and ARKK created the labels for Wahlburgers Pickles.

20.    Defendant Wahlburgers I, LLC is a limited liability company organized under the laws of Massachusetts with its headquarters in Hingham, Massachusetts. Wahlburgers I, LLC owns the Wahlburgers trademark that appears on the Wahlburgers Pickles' labels and, upon information and belief, has licensed these trademarks to ARKK. Upon information and belief, as the licensor of the Wahlburgers trademarks and by its contractual relationship with ARKK, Wahlburgers I, LLC has control over the Wahlburgers Pickles' recipes and labeling.

21.    Defendants sell the Pickles throughout the United States, including New York. The Pickles, including those purchased by Plaintiff and Class members, are available at various retail stores throughout the United States, including New York. Defendants authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the Pickles to consumers nationwide, including New York.

## JURISDICTION AND VENUE

22.    This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendants, and (4) there are more than 100 Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

23.    This Court has personal jurisdiction over Defendants because the claims asserted in this complaint arise from Defendants' contacts with this District. Defendants have been afforded due process because they have, at all times relevant to this matter, individually or through their agents, subsidiaries, officers, and/or representatives, operated, conducted, engaged in, and carried on a business venture in New York, and/or marketed, advertised, distributed and/or sold the

Products, committed a statutory violation within New York related to the allegations made herein, and caused injuries to Plaintiff and putative Class Members, which arose out of the acts and omissions that occurred in the state of New York, during the relevant time period. At that time, Defendants were engaged in business activities in New York.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in New York. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants conduct substantial business in this District, have sufficient minimum contacts with this District, and otherwise purposely avails themselves of the markets in this District through the promotion, sale, and marketing of the Products in this District. Venue is also proper because Plaintiff resides in this District.

## COMMON FACTUAL ALLEGATIONS

**I.    Wahlburgers' Fast Rise in the Food Industry**

25.     Wahlburgers' first brick-and-mortar restaurant opened in 2011.[6]

26.     Wahlburgers sells burgers, sandwiches, and other tasty foods that people enjoy eating.[7]

27.     After only three (3) years of opening its first restaurant, Wahlburgers began franchising the restaurants.

28.     By 2023, Wahlburgers now has nearly 100 restaurants in states throughout the United States.[8]

---

[6] https://wahlburgers.com/our-story. (Last accessed April 12, 2023).
[7] https://wahlburgers.com/menu. (Last accessed April 12, 2023).
[8] https://wahlburgers.com/all-locations. (Last accessed April 12, 2023).

29.     Seeking to build on its success in the restaurant market, Wahlburgers launched its Wahlburgers at Home product line in approximately 2021. According to Wahlburgers, "We embrace loyalty, gratitude, excellence, and community. We share these values in our restaurants every day and now in your home."[9] Wahlburgers at Home's product line includes everyday consumer products in grocery stores, including meats, bacon, hotdogs, sauces, and pickles.[10]

30.     Wahlburgers continues its aggressive push to expand its business and make more money with plans to build 50 restaurants across Mexico.[11]

31.     Wahlburgers is quickly becoming an industry leader in the food industry, and they are undoubtedly a well-known nationwide brand continuing to gain market share.

32.     Wahlburgers seeks to build trust among its customers by touting, "As we expand our restaurant locations worldwide, it was only natural that we offer our high quality products for your home."[12] Accordingly, reasonable consumers, including Plaintiff and Class members, trust and expect that Wahlburgers sells high quality products that are accurately and truthfully labeled.

**II.    Wahlburgers Pickles' Labeling Contains False and Misleading Representations**

33.     Wahlburgers markets sells, and distributes Pickles, including Fresh Dill Spears; Fresh Dill Chips; Fresh Dill Chips Hot. Each product is depicted below[13]:

---

[9] https://www.wahlburgersathome.com/our-story/. (Last accessed April 12, 2023).
[10] https://www.wahlburgersathome.com/products/. (Last accessed April 12, 2023).
[11] Wahlburgers has already expanded internationally to Canada, Australia, and New Zealand.
[12] https://www.wahlburgersathome.com/our-story/. (Last accessed April 12, 2023).
[13] These images are found on Wahlburgers' website: https://www.wahlburgersathome.com/products/pickles/. (Last accessed Jan. 16, 2023).







34.    Wahlburgers Pickles are manufactured, distributed, and sold throughout the United States, including the State of New York. The Pickles are sold in-store at mass market retailers and grocery stores.

35.    Right on the front labeling of all the Pickles, Wahlburgers represents the Pickles accordingly:

- The labels all prominently feature the word "FRESH" in all capitals as the first word in their names, which are printed multiple times on their labels;

- The labels all prominently represent that the Pickles have "no preservatives"; and

- The labels all prominently represent that the Pickles are "all natural."



36.    Defendants' claims that Wahlburgers pickles are "fresh," "all natural," and contain "no preservatives" are false and misleading. Testing performed by Biogen Laboratory Developments reveals that Wahlburgers Pickles contain substantial amounts of benzoic acid, often added to foods via sodium benzoate, an artificial chemical preservative designed to lengthen the Pickles' shelf life. In fact, certificates of analysis from Biogen's testing (attached hereto as Exhibits A and B) indicate[14], for example, Wahlburgers Hot Dill Chips pickles (a.k.a "Wahlburgers Fresh Dill Chips Hot") contain sodium benzoate in a concentration of 641 parts per million; Wahlburgers Dill Spears pickles (a.k.a. "Wahlburgers Fresh Dill Spears") contain sodium benzoate in a

---

[14] Biogen's tests revealed the amounts of benzoic acid indicated on Exhibits A and B, and benzoic acid is almost always added to food via sodium benzoate, an artificial chemical preservative, sodium benzoate.

concentration of between 424 and 436 parts per million. Wahlburgers Dill Chips pickles (a.k.a. "Wahlburgers Fresh Dill Chips") contain sodium benzoate in a concentration of 600 parts per million. As such, the Pickles' labeling Representations that the Pickles contain "no preservatives" and that the Pickles are "all natural" are false and misleading because the Pickles contain an artificial chemical preservative.

37.     According to a sworn declaration by the expert conducting the Biogen testing:

> The level of **sodium benzoate detected across all samples is present at intentional usage levels** that the brine has been formulated with. Every Wahlburgers pickle sample received over a span of time, ranging from July 2022 into January 2023 from multiple geographies, contained similar levels of sodium benzoate. This trend illustrates a standard operating procedure for producing Defendants' "all natural" product with "no preservatives."

*See* Ex. B, ¶ 2 (emphasis added).

38.     The expert further stated, "[t]he data generated over the course of our investigation reveals a trend with relatively consistent levels of sodium benzoate which illustrates a **known process**." Ex. B., ¶ 5 (emphasis added).

39.     Based on the consistency of the test results, as well as the sworn statement of the Biogen expert, on information and belief, Defendants intentionally included sodium benzoate in the Products throughout the class period.

40.     Moreover, Defendants' labeling Representations are affirmations of fact or promises that became part of the basis of the bargain between Plaintiff, Class Members, and Defendants when purchasing the Pickles.

41.     Plaintiff and the Class members paid for "fresh," "all natural," and preservative free products but did not receive what they paid for. The Products Plaintiff and the Class members received were worth less than those they paid.

42.     Based on Defendants' misleading and deceptive representations, Defendants were able to, and did, charge a premium price for the Products over the cost of competitive products that did not claim to be "fresh," "all natural," and/or preservative free.

43.     Plaintiff and the Class members all paid money for the Products. However, Plaintiff and the Class members did not obtain the product's full value due to Defendants' misrepresentations. Plaintiff and the Class members paid more for the Product than they would have had they known the truth. Consequently, Plaintiff and the Class members have suffered an injury and lost money due to Defendants' wrongful conduct.

## III.    Defendants Also Make Omissions of Material Facts Regarding the Pickles

44.     Defendants' omission of the artificial chemical preservative, sodium benzoate, from the Pickles' labeling is also deceptive.

45.     Sodium benzoate is manufactured in one of three ways:

a.  naphthalene is oxidized with vanadium pentoxide to give phthalic anhydride, which is decarboxylated to yield benzoic acid;

b.  toluene is mixed with nitric acid and oxidized to produce benzoic acid; or

c.  benzotrichloride is hydrolyzed and then treated with a mineral acid to produce benzoic acid.[15]

In each instance, the benzoic acid is refined to produce sodium benzoate, including dissolving the benzoic acid in a sodium hydroxide solution. *Id.*

46.     Regardless of the method used, sodium benzoate is thus produced through a chemical process and/or chemical synthesis. Regardless of the base material used, it has undergone

---

[15]  Sodium Benzoate, ENCYLOPEDIA.COM (updated May 18, 2018), available at https://www.encyclopedia.com/science-and-technology/chemistry/organic-chemistry/sodium-benzoate

a chemical change, so the sodium benzoate is chemically and/or structurally different from how it naturally occurred.

47.    In 2013, the United States Department of Agriculture ("USDA") issued a Draft Guidance Decision Tree for the Classification of Materials as Synthetic or Nonsynthetic (Natural). Under this decision tree, a substance is natural—as opposed to synthetic—if: (a) it is manufactured, produced, or extracted from a natural source (i.e., naturally occurring mineral or biological matter); (b) it has not undergone a chemical change (i.e., a process whereby a substance is transformed into one or more other distinct substances) so that it is chemically or structurally different than how it naturally occurs in the source material; or (c) the chemical change was created by a naturally occurring biological process such as composting, fermentation, or enzymatic digestion or by heating or burning biological matter.

48.    Congress has defined "synthetic" to mean "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plants, animals, or mineral sources . . . ." 7 U.S.C. § 6502 (21).

49.    Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale. Consumers would not know the true nature of the ingredients merely by reading the ingredients label.

50.    Discovering that the ingredients are not natural and are actually synthetic requires a scientific investigation and knowledge of chemistry beyond that of the average consumer.

51.    Defendants' labeling Representations that the Pickles are "fresh" are also false and misleading. "Fresh" products do not contain artificial chemical preservatives; thus, because the Pickles contain an artificial chemical preservative, they are not "fresh." See 21 C.F.R. § 101.95(a)

(stating the term "fresh" can be used when food "has not been frozen or subjected to any form of thermal processing or any other form of preservation").

52.    Defendants engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions regarding an artificial chemical preservative contained in the Pickles.

53.    If Defendants had disclosed, at the point of purchase, to Plaintiff and putative class members that the Pickles contained sodium benzoate, they would not have purchased the Pickleswould have paid less for the Pickles.

54.    As a consumer food product seller, Defendants had a duty to ensure that the Pickles did not contain sodium benzoate, including through regular testing, especially before injecting the Pickles into the stream of commerce for consumers to eat. But based on the testing results set forth above, Defendants made no reasonable effort to test their Pickles for sodium benzoate, despite their false and misleading labeling Representations discussed above. The same Defendants claim: "We embrace loyalty, gratitude, excellence, and community. We share these values in our restaurants every day and now in your home." *And* "[We] offer our high quality products for your home." Moreover, Defendants represented and warranted, expressly and impliedly, that the Pickles were of merchantable quality, complied with federal and state law, and did not contain an artificial chemical preservative, sodium benzoate. All of these claims are false.

### IV.  Defendants' Knowledge, Representations, Omissions, and Concealment of Material Facts Deceived Plaintiff and Reasonable Consumers – This Conduct is Deceptive, False, and Misleading under the GBL

55.    Testing performed by Biogen Laboratory Developments reveals that the Pickles contain substantial amounts of benzoic acid, which is often added to foods via sodium benzoate, an artificial chemical preservative designed to lengthen the Pickles' shelf life. In fact, certificates

of analysis from Biogen's testing (attached hereto as **Exhibits A and B**) indicate[16], for example, Wahlburgers Hot Dill Chips Pickles (a.k.a "Wahlburgers Fresh Dill Chips Hot") contain sodium benzoate in a concentration of 641 parts per million; Wahlburgers Dill Spears Pickles (a.k.a. "Wahlburgers Fresh Dill Spears") contain sodium benzoate in a concentration of between 424 and 436 parts per million; and Wahlburgers Dill Chips Pickles (a.k.a. "Wahlburgers Fresh Dill Chips") contain sodium benzoate in a concentration of 600 parts per million.

56.     Upon information and belief, Defendants' addition of an artificial chemical preservative to the Pickles and the effects thereof afford Defendants' Pickles a longer shelf life than truly fresh pickles and allow Defendants to hold inventory longer than they otherwise would be able to hold truly fresh pickles. On information and belief, this artificially enhanced shelf life and ability to hold inventory longer afford Defendants a competitive advantage that is not available to companies that produce genuinely fresh pickles.

57.     And to drive up sales in the competitive food industry and expand market share, Defendants knowingly omit the fact that the Pickles contain an article chemical preservative.

58.     Thus, reasonable consumers shopping for fresh, and/or all natural, and/or preservative-free pickles purchase Defendants' Pickles based on the above Representations and omissions made by Defendant at the point of sale. But for Defendants' false and misleading labeling Representations, these customers would not have purchased Defendants' Pickles or would not have paid as much as they did.

59.     Additionally, a large cross-section of customers, particularly those that are a part of the "real food" or "clean labeling" movements, will not consider purchasing products that contain artificial preservatives. These customers chose to purchase Wahlburgers Pickles based on the false

---

[16] Biogen's tests revealed the amounts of benzoic acid indicated on **Exhibits A and B**, and benzoic acid is almost always added to food via sodium benzoate, an artificial chemical preservative, sodium benzoate.

belief that they did not contain artificial preservatives. But for Wahlburgers' false and misleading labeling statements, these customers would not have purchased Wahlburgers Pickles or paid less for the Pickles.

60.     Wahlburgers, a large, sophisticated company in manufacturing, distributing, and selling consumer food products, knew or should have known the Pickles contained an article chemical preservative.

61.     Defendants sold, and continue to sell, the Pickles containing an artificial chemical preservative during the relevant class period despite Defendants' knowledge of the presence of sodium benzoate in the Pickles.

62.     Sodium benzoate is not listed on the Pickles' labels as an ingredient, nor is there any disclosure about sodium benzoate's inclusion (or potential inclusion) in the Pickles.

63.     Defendants have engaged in deceptive, untrue, and misleading advertising by making labeling Representations discussed above. Defendants' conduct is also deceptive because Defendants omit the material fact that the Pickles contain sodium benzoate.

64.     Plaintiff and the Class members would not have purchased the Pickles or paid as much for them had they been truthfully and accurately labeled.

65.     Had Defendants adequately tested the Pickles for sodium benzoate, they would have discovered that the Pickles contained sodium benzoate, making the Products containing the false Representations illegal to distribute, market, and sell.

66.     Defendants' concealment was material and intentional because people are concerned with what is in the foods they eat. Consumers such as Plaintiff and class members make purchasing decisions based on the Representations made on the Products' labeling, including the ingredients listed.

67.    Defendants know that if they had not omitted that the Pickles contained or risked containing sodium benzoate, then Plaintiff and class members would not have purchased the Pickles or would not have paid as much as they did.

**V.    Injuries to Plaintiff and Class Members – and the Public at Large**

68.    When Plaintiff purchased Defendants' Pickles, Plaintiff did not know and had no reason to know that Defendants' Pickles contained or risked containing an artificial chemical preservative. Not only would Plaintiff not have purchased Defendants' Pickles had he known the Pickles contained an artificial chemical ingredient, but he would also not have been capable of purchasing them if Defendants had done, as the law requires, and tested the Products for such ingredients and accurately labeled the Pickles.

69.    Consumers cannot test or independently ascertain or verify whether a product contains an artificial chemical preservative, such as sodium benzoate, especially at the point of sale. Therefore, they must trust and rely on Defendants to truthfully and honestly report what the Products contain on their packaging and labeling.

70.    Further, given Defendants' position as a nationwide leader in the food industry, Plaintiff and all reasonable consumers trusted Defendants' Representations and omissions regarding the Pickles.

71.    Yet, when consumers look at the Pickles' packaging, there is no mention of sodium benzoate or any preservative. It is not listed in the ingredients section, nor is there any disclosure about its inclusion in the Pickles.

72.    No reasonable consumer, including Plaintiff, would have paid as much for Defendants' Pickles containing the Representations had they known those Pickles contain or may contain any amount of sodium benzoate, let alone at the limits found in Defendants' Pickles – making such omitted facts material to them.

73. Defendants' false, misleading, and deceptive Representations and omissions made onthe Pickles' labeling are likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiff and the Class Members.

74. As alleged above, Plaintiff and Class members' Products either contained sodium benzoate or were at significant risk of containing the same.

## CLASS ALLEGATIONS

75. Plaintiff brings this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of herself and a class defined as follows:

> All persons who purchased the Product within New York for personal, family, or household use during the fullest period of law. ("Class")

76. Plaintiff reserves the right to modify, change or expand the definitions of the Class based upon discovery and further investigation.

77. *Numerosity*: The Class is so numerous that the joinder of all members is impracticable. The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendants' possession.

78. *Commonality*: Questions of law or fact common to the Class include, without limitation:

    a. Whether Defendants' conduct as alleged is consumer oriented;

    b. Whether the Representations are material to consumers;

    c. Whether the omissions were material to consumers;

    d. Whether the Representations are misleading to consumers;

    e. Whether the omissions were misleading to consumers;

    f. Whether the Products contain an artificial chemical ingredient;

g.  Whether Defendants knew or should have known that the Pickles contain an artificial chemical ingredient;

h.  Whether Defendants' Representations are deceptive;

i.  Whether Defendants' Representations are false and misleading;

j.  Whether Defendants failed to disclose that the Pickles contain an artificial chemical ingredient;

k.  Whether Defendants concealed that the Pickles contain an artificial chemical preservative or ingredient;

l.  Whether Defendants charged a premium price for the Products; and

m.  Whether Plaintiff and the class members were injured.

79.  *Typicality*: Plaintiff's claims are typical of the claims of Class members. Plaintiff and Class members were injured and suffered damages in the same manner, have the same claims against Defendants relating to the same course of conduct, and are entitled to relief under the same legal theories.

80.  *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in prosecuting complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to prosecute this action vigorously.

81.  *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable, and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to

bring separate actions, this Court would be confronted with multiple lawsuits burdening the court system and creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale, and comprehensive supervision by a single court. Plaintiff is unaware of any difficulties likely to be encountered in managing this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF NEW YORK GBL § 349
**(On Behalf of Plaintiff and the Class Members)**

82.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

83.     New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

84.     The conduct of Defendants alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff and the other Class Members seek monetary damages.

85.     Defendants misleadingly and deceptively represent the Products to consumers.

86.     Defendants further omitted material facts, including the presence of sodium benzoate in the Products (or that the Products risked containing sodium benzoate).

87.     Defendants' unlawful consumer-oriented conduct is misleading materially because Plaintiff and the other class members believed that the Products were "fresh," "all natural," and preservative free and did not contain sodium benzoate.

88.     Plaintiff and other Class Members paid extra money for accurately labeled Products that were "fresh," "all natural," and preservative free and did not contain sodium benzoate. Had Plaintiff and reasonable consumers known that the Products were not "fresh," "all natural," and preservative free, and contained sodium benzoate, they would not have purchased them at all or at least not have paid as much for them.

89.     Defendants engaged in its unlawful conduct as alleged herein willfully, wantonly, and with reckless disregard for the truth.

90.     Plaintiff and other Class Members have been injured inasmuch as they, having viewed the Products label, and paid a premium for the Products. Accordingly, Plaintiff and other Class Members paid more than the Products they bargained for and received were worth.

91.     Defendants' conduct as alleged herein constitutes a deceptive act and practice in business conduct violating New York General Business Law §349(a), and Plaintiff and other Class members have been damaged thereby.

92.     As a result of Defendants' deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, interest, and attorneys' fees and costs. This includes actual damages under GBL § 349 and statutory damages of $50 per unit purchased pursuant to GBL § 349.

**SECOND CAUSE OF ACTION**
**VIOLATION OF NEW YORK GBL § 350**
**(On Behalf of Plaintiff and the Class Members)**

93.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates such allegations by reference herein.

94.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

95.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

96.     Defendants' labeling contains a deceptive and materially misleading statement concerning its Products inasmuch as they misrepresented the Products were "fresh," "all natural," and preservative free, and did not contain sodium benzoate.

97.     Defendants' labeling contains deceptive and materially misleading omissions concerning sodium benzoate.

98.     Plaintiff and other Class Members have been injured since they, having viewed Defendants' label, paid a premium for the Products. Plaintiff and other Class Members paid more than the Products they bargained for and received were worth.

99.     Defendants engaged in unlawful conduct as alleged herein willfully, wantonly, and with reckless disregard for the truth.

100.    Defendants' material misrepresentations and omissions were uniform.

101.    As a result of Defendants' acts and practices in violation of GBL § 350, Plaintiff and class members are entitled to monetary and compensatory damages, restitution, and disgorgement of all monies obtained using Defendants' unlawful conduct, interest, and attorneys' fees and costs, as well as statutory damages of $500 per Product purchased.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class requests the Court:

(i)     Enter an order certifying the proposed Class under Federal Rule of Civil Procedure 23(a) and (b)(3), as set forth above, naming Plaintiff as Class Representative of the Class and appointing undersigned counsel for Plaintiff as Class Counsel;

(ii)     Enter an order declaring that Defendants are financially responsible for notifying the Class members of the pendency of this suit;

(iii)     Issue judgment declaring that Defendants have committed the violations of law alleged herein;

(iv)     Issue judgment awarding statutory damages in the maximum amount for which the law provides;

(v)     Issue judgment awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount that the Court or jury will determine in accordance with applicable law;

(vi)     Issue judgment providing for any and all equitable monetary relief the Court deems appropriate;

(vii)     Issue judgment awarding punitive or exemplary damages in accordance with proof and an amount consistent with applicable precedent;

(viii)     Issue judgment awarding Plaintiff his reasonable costs and expenses of suit, including attorneys' fees;

(ix)     Issue judgment awarding pre-and post-judgment interest to the extent the law allows; and

(x)    Awarding such further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial on all claims so triable.

Date: June 21, 2023                          Respectfully submitted,

**REESE LLP**
*/s/ Charles D. Moore*
Charles D. Moore
121 N. Washington Ave, 4th Floor
Minneapolis, Minnesota 55401
Telephone: 212-643-0500
Email: *cmoore@reesellp.com*

**REESE LLP**
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
Email: *mreese@reesellp.com*

**LAUKAITIS LAW LLC**
Kevin Laukaitis (Pro hac vice application
forthcoming)
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, Puerto Rico 00907
Phone: (215) 789-4462
E-mail: klaukaitis@laukaitislaw.com

*Attorneys for Plaintiff and the Proposed Class*